[Cite as *State v. Richardson*, 2017-Ohio-9229.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   26191 |
| | : | |
| v. | : | T.C. NO. 12CR3299 |
| | : | |
| CLINTON RICHARDSON | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 22nd day of December, 2017.

. . . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

KRISTIN L. ARNOLD, Atty. Reg. No. 0088794, 1502 Liberty Tower, 120 W. Second Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Clinton Richardson was convicted after a bench trial in the Montgomery County Court of Common Pleas of operating a vehicle while under the influence of drugs or alcohol (prior felony OVI within 20 years/test refusal), a third-degree felony, and endangering children, a first-degree misdemeanor. Specifically, the State asserted that Richardson had driven while under the influence of hydrocodone; Richardson's child was in the vehicle at the time. On appeal, Richardson claimed that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 2} On March 4, 2015, we vacated Richardson's conviction on the ground that it was based on insufficient evidence. *State v. Richardson*, 2015-Ohio-757, 29 N.E.3d 354 (2d Dist.). We reasoned that the State's evidence "was not sufficient to establish a nexus between Richardson's impairment and any painkiller he was or was not taking." *Id.* at ¶ 26. In light of our holding, we did not address Richardson's manifest weight argument.

{¶ 3} The State appealed our judgment, and the Ohio Supreme Court reversed. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993. The Supreme Court noted, as we found, that there was sufficient evidence to establish that Richardson had ingested hydrocodone and that Richardson was impaired. However, the Court further concluded that there was sufficient evidence to support his OVI conviction, stating:

> The dissent asserts that no rational factfinder could have linked Richardson's ingestion of hydrocodone with his demonstrated impairment. Dissenting opinion at ¶ 32. When the effects of a drug are sufficiently well known — as they are with hydrocodone — expert testimony linking

ingestion of the drug with indicia of impairment is unnecessary. And there *was* lay testimony that connected Richardson's impairment to the hydrocodone, i.e., the testimony of an experienced and well-trained police officer. On these facts, we hold that the evidence was sufficient to support Richardson's OVI conviction.

(Emphasis in original.) *Id.* at ¶ 19. The Supreme Court remanded the matter to this appellate court for consideration of Richardson's manifest weight argument.

{¶ 4} For the following reasons, we conclude that Richardson's convictions were not against the manifest weight of the evidence. Accordingly, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 5} According to the State's evidence, at approximately 4:30 p.m. on October 31, 2012, Richardson rear-ended Deborah Leopold's vehicle as she waited at a traffic light to turn left from Third Street onto Wayne Avenue in Dayton. Richardson had not been driving fast, and there was no damage to Leopold's vehicle. When Leopold got out of her vehicle to talk with Richardson, she noticed that Richardson's speech was "very slurred and pretty much incomprehensible" and that he did not make eye contact. He also "fumbled" with his wallet and dropped all of his cards on the street while looking for his insurance information. Leopold did not notice any odor of an alcoholic beverage or see any open containers or drugs in Richardson's truck. She did notice that Richardson had a small child in the back seat, and she was concerned about Richardson's ability to drive. She called the police.

{¶ 6} Dayton Police Officer Jonathan Miniard and his partner responded to the

accident. Miniard approached Richardson in his vehicle and observed Richardson with "both hands on the steering wheel kind of slumped forward staring ahead." It took Richardson a moment to register the officer's presence. Miniard noticed a burnt smell, and he learned that Richardson had tried to light a cigarette and it singed the side of his hair. Richardson's truck was still running, so Officer Miniard asked Richardson to turn it off. Richardson "couldn't figure out how to put it back into park;" Officer Miniard did that for him and turned off the vehicle.

{¶ 7} Officer Miniard asked Richardson to exit his vehicle. When he got out, he slid out of the driver's seat and was unsteady. The officer escorted Richardson to the front of his cruiser. Miniard asked Richardson if he had drunk anything or taken any medication. Richardson denied that he had consumed any alcohol, but stated that he was on pain medication. When asked if he had taken any, Richardson responded, "Yeah." Miniard noticed that Richardson had slurred speech, seemed to have difficulty understanding questions, and gave incoherent answers. Richardson told Miniard that he had to get his son home.

{¶ 8} Officer Miniard testified that he had been involved in numerous OVI investigations in his 14 years as a Dayton police officer and that he had taken training and refresher courses on OVI detection. Miniard decided to administer field sobriety tests on Richardson, and he conducted the horizontal gaze nystagmus (HGN) test, the walk and turn test, and the one-leg stand test. Miniard noticed a 45 degree angle of nystagmus and slight jerking in Richardson's eyes during the HGN test, which indicated impairment. Richardson also had difficulty paying attention during the test. On the walk and turn test, Richardson exhibited seven out of eight "clues" indicating possible

impairment. Officer Miniard marked three out of a possible four clues for impairment on the one-leg stand test. Miniard concluded that Richardson was under the influence of "some type of possibly narcotics," and he placed Richardson under arrest.

{¶ 9} Officer Miniard read Richardson BMV 2255 and asked him if he would submit to a blood test. Richardson refused. No chemical tests were performed. Richardson never indicated to Officer Miniard that he was having a medical emergency, and he did not ask for medical treatment; Richardson had reported to the officer that he had a bad back and problems with his neck prior to the accident. Miniard transported Richardson to jail.

{¶ 10} The parties stipulated at trial that Richardson was previously convicted of felony OVI in *State v. Richardson*, Warren C.P. No. 2006 CR 23305.

{¶ 11} On January 28, 2013, Richardson was indicted for OVI, in violation of R.C. 4511.19(A)(2), and endangering children, in violation of R.C. 2919.22(C)(1). R.C. 4511.19(A)(2) provides:

No person who, within twenty years of the conduct described in division (A)(2)(a) of this section, previously has been convicted of or pleaded guilty to a violation of this division, a violation of division (A)(1) or (B) of this section, or any other equivalent offense shall do both of the following:

(a) Operate any vehicle, streetcar, or trackless trolley within this state while under the influence of alcohol, a drug of abuse, or a combination of them.

(b) Subsequent to being arrested for operating the vehicle, streetcar, or trackless trolley as described in division (A)(2)(a) of this section, being

asked by a law enforcement officer to submit to a chemical test or tests under [R.C. 4511.191], and being advised by the officer in accordance with [R.C. 4511.192] of the consequences of the person's refusal or submission to the test or tests, refuse to submit to the test or tests.

Because Richardson had a prior felony OVI conviction, the OVI was charged as a third-degree felony. R.C. 2919.22(C)(1) prohibits operating a vehicle in violation of R.C. 4511.19 with a child in the vehicle.

{¶ 12} Richardson subsequently moved to suppress the statements he made to the police. After a hearing, the trial court ruled that the statements Richardson made after exiting his car and prior to being placed in the cruiser were admissible. However, the trial court suppressed the statements Richardson made in the cruiser prior to being given *Miranda* warnings and, because he did not voluntarily waive his *Miranda* rights, all statements made afterward.

{¶ 13} Richardson waived a jury trial, and the matter was tried to the court. The State offered the testimony of Ms. Leopold and Officer Miniard, as summarized above. Richardson did not make a Crim.R. 29(A) motion at the end of the State's case. Richardson then testified on his own behalf, and presented the testimony of Dr. Charles Russell; after questioning regarding his qualifications, the trial court found Dr. Russell to be an expert in chemical dependency.

{¶ 14} Richardson stated at trial that he had suffered numerous broken bones (including both femurs, hip, elbow, vertebrae, and wrist) and other injuries and had been to two different pain clinics in the past three years; for several years, he received a prescription for "hydrocodone acetaminophen." In October 2012, he generally took three

pills per day. He testified that he had run out of medication on October 29, 2012 (two days before the accident), was suffering from hydrocodone withdrawal at the time of the accident, and that he had not consumed alcohol or drugs. He testified that he was trying to go to the hospital at the time of the accident.

{¶ 15} Dr. Russell testified that Richardson was opiate tolerant on October 31, 2012, and that he was taking medication with 325 mg of acetaminophen and 10 mg of hydrocodone, three times a day. Dr. Russell described the symptoms of opiate withdrawal and stated that the symptoms Richardson described were consistent with withdrawal. Dr. Russell concluded that "there's a decent possibility that he was withdrawing from opiates, but I wouldn't call that a reasonable degree of medical certainty."

{¶ 16} Upon consideration of the evidence, the trial court found Richardson guilty of both offenses. On May 6, 2014, the trial court sentenced Richardson to one year in prison for OVI, of which 120 days were mandatory, and to six months in jail for endangering children, to be served concurrently. Richardson was required to attend and complete mandatory drug and alcohol treatment. The trial court further ordered a lifetime suspension of Richardson's driver's license and that his 1998 Dodge Ram truck be forfeited to the Dayton Police Department. Richardson did not file a motion to stay his sentence.

{¶ 17} As discussed above, Richardson appealed from his convictions, claiming that his convictions were against the manifest weight of the evidence and based on insufficient evidence. Based on the remand from the Ohio Supreme Court, the matter is now before us for consideration of Richardson's manifest weight argument.

**{¶ 18}** We note that Richardson died on February 5, 2016, while his appeal was pending before the Ohio Supreme Court. Upon remand, we ordered the parties to advise us how or whether this appeal should proceed in light of Richardson's death. On August 9, 2017, we granted the State's motion, pursuant to App.R. 29(A), to substitute Richardson's appellate counsel as the party/representative in this appeal.

## II. Manifest Weight of the Evidence

**{¶ 19}** "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 20}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations

does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

{¶ 21} In *State v. May*, 2d Dist. Montgomery No. 25359, 2014-Ohio-1542, we discussed in detail the evidence that is required to prove a violation of R.C. 4511.19 based on medication. We stated:

[W]hen a prosecution under R.C. 4511.19(A)(1)(a) is based on driving under the influence of medication, the State must do more than simply present evidence that the defendant has taken the medication and shows signs of impairment. The United States Food and Drug Administration has approved more than a thousand prescription drugs (which are "drugs of abuse" under Ohio law), all of which may have any number of different side effects. Not all side effects involve the impairment of judgment or reflexes. Although some medications may be familiar to some jurors, the various physiological effects of different medications [are] outside the common knowledge of most jurors and many trial judges.

The essence of R.C. 4511.19(A)(1)(a) is to prohibit impaired driving while under the influence. It is certainly not intended to criminalize the operation of a vehicle by a person taking a cholesterol or blood pressure medication, let alone an anti-narcoleptic or ADHD prescription, unless that drug negatively influences the defendant's driving abilities. And in many situations, especially those involving prescription drugs, this can only be proved by direct testimony linking the influence of the drug to the driving.

This could be established through the testimony of an expert who is familiar with the potential side effects of the medication, or perhaps of a layperson (such as a friend or family member) who witnessed the effect of the particular drug on the defendant-driver.

We therefore conclude that, in order to establish a violation of R.C. 4511.19(A)(1)(a) based on medication, the State must also present some evidence (1) of how the particular medication actually affects the defendant, and/or (2) that the particular medication has the potential to impair a person's judgment or reflexes. Without that information, the jury has no means to evaluate whether the defendant's apparent impairment was due to his or her being under the influence of that medication.[1]

We emphasize that the State is not required to support its case under R.C. 4511.19(A)(1)(a) with evidence of the exact amount of alcohol or the drug of abuse that was consumed or ingested by the defendant. It is often the case that, upon initiating a traffic stop, a police officer detects an odor of an alcoholic beverage on the driver and there is no available evidence as to the exact amount that the defendant consumed. However, as noted by the Ohio Supreme Court, "almost any lay witness, without having any special qualifications, can testify as to whether a person was intoxicated." *Columbus v. Mullins*, 162 Ohio St. 419, 421, 123 N.E.2d 422 (1954). In all cases, a jury must determine, based on totality of the evidence, whether the

---

[1]This requirement does not extend to violations of R.C. 4511.19(A)(1)(b)-(j), since these are per se violations based on the legislature's implicit determinations that specific concentrations of specific drugs negatively influence driving.

defendant was driving under the influence of alcohol and/or a drug of abuse. (Additional citations omitted.) *May* at ¶ 46-49. *See also, e.g., State v. Husted*, 2014-Ohio-4978, 23 N.E.3d 253 (4th Dist.) (State failed to identify drug that was consumed, nor was there evidence of how the unspecified drug affected the defendant or had the potential to impair a person's judgment or reflexes).

**{¶ 22}** The Ohio Supreme Court's ruling in *Richardson* did not change the requirement that the State provide evidence of a nexus between the ingestion of a substance of abuse and the driver's impairment. Rather, the Supreme Court held that, *under the facts of this case*, the State *had* presented sufficient evidence of that nexus.[2]

**{¶ 23}** At trial, Officer Miniard and Leopold testified about Richardson's behavior, which reflected that Richardson was impaired at the time of the accident. Miniard testified in detail about the field sobriety tests that he conducted and that Richardson performed poorly on each of those tests. The State also played a small portion of the video from the police cruiser, which reflected that Richardson was slow to respond to questions, inattentive, and needed assistance walking.

**{¶ 24}** Richardson testified that he sought treatment for severe pain in June 2010 and was prescribed a variety of strong pain medications, including hydrocodone. In

---

[2] The Ohio Supreme Court accepted this case as both a jurisdictional appeal and certified conflict case. The Supreme Court asked the parties to brief the following question: "Once the State presents evidence that a person is impaired and has taken a specific prescription medication, is the trier of fact able to draw a reasonable inference that the driver has violated R.C. 4511.19(A)(1)(a) or R.C. 4511.19(A)(2), without evidence (lay or expert) as to how the medication actually affects the driver and/or expert testimony about whether the particular medication has the potential to impair a person's judgment or reflexes?" *State v. Richardson*, 143 Ohio St.3d 1439, 2015-Ohio-3427, 36 N.E.3d 187, quoting 2d Dist. Montgomery No. 26191 (May 27, 2015). In its opinion, the Supreme Court decertified the conflict and declined to answer the certified-conflict question. *Richardson*, 2016-Ohio-8448, at ¶ 11.

March 2012, Richardson saw Dr. Saleh, who prescribed a medication consisting of 10 mg hydrocodone and 325 mg acetaminophen; at that time, Richardson took six tablets per day. Richardson testified that, in October 2012, he generally took three pills per day. As emphasized by the Supreme Court, the prosecutor asked Richardson at trial about the portion of the video where Officer Miniard asked Richardson about what he had taken; Richardson's responses indicated that he had told the officer that he (Richardson) had taken 30 mg of hydrocodone, which was consistent with Richardson's having taken three pills. The trial court reasonably concluded that Richardson had ingested hydrocodone.

**{¶ 25}** As noted above, the Supreme Court found that the State had presented evidence linking Richardson's ingestion of hydrocodone to his demonstrated impairment. The court concluded that the effects of hydrocodone were "well known" and that Officer Miniard's testimony provided evidence of a nexus between Richardson's ingestion of hydrocodone and his impairment.

**{¶ 26}** In contrast, Richardson testified that he did not experience side effects from hydrocodone and that, instead, he had been experiencing the effects of withdrawal from hydrocodone at the time of the collision. When asked how the medication affected him, Richardson responded, "By this point in time, I had been taking the painkiller medication for so long they no longer had any real side effects, you know, that I felt any kind of drowsiness, dizziness, feelings of euphoria, if you will, anything of that nature that would cloud your judgment. Long ago, I stopped having these side effects. The narcotic painkiller basically just did its job and numbed the pain." Defense counsel asked Richardson if he suffered from confusion, disorientation, or problems with balancing, walking, or focus while on hydrocodone; Richardson responded that he did not.

Richardson testified that he continued taking the combined acetaminophen/hydrocodone medication until October 2012, at which time he was taking three per day. He stated, "[B]y this time, I had been taking narcotic painkillers for, every day for two-and-a-half years so I felt no side effects from those, whatsoever."

{¶ 27} During his testimony, Richardson also described his symptoms of hydrocodone withdrawal. He stated that he had insomnia and had not slept for two nights, he was disoriented, fatigued, weak, sweating, had cold chills, vomiting, and diarrhea. Richardson testified that he suffered from all of those symptoms at the time of the accident. Richardson further testified that he had suffered from withdrawal one prior time in 2010, and he had similar symptoms. Richardson testified that he had run out of medicine two days before the collision; he could not explain why he had run out.

{¶ 28} Dr. Russell's testimony focused on whether Richardson's symptoms constituted symptoms of withdrawal. On cross-examination, the State asked Dr. Russell several questions related to whether Richardson's medical records provided an explanation for Richardson's poor performance on the field sobriety tests. Richardson's medical records generally did not indicate that he suffered from conditions that would affect his performance on the tests. Dr. Russell was not asked about the actual or potential effects of 10 mg of hydrocodone on Richardson.

{¶ 29} Considering all of the evidence presented at trial, we cannot conclude that Richardson's convictions were against the manifest weight of the evidence. There was substantial evidence that Richardson was driving while impaired and there was conflicting evidence as to whether Richardson's poor performance on the field sobriety tests could be explained by hydrocodone withdrawal. Richardson testified that he was "opiate

tolerant" and denied having any side effects from his medication; he stated that hydrocodone simply provided pain relief. However, the trial court could have concluded that Richardson did not testify truthfully about his medication usage, particularly given that he should have had a supply of medication to last until November 9, he could not explain why he ran out of medication early, and he denied taking more than prescribed (three per day).

{¶ 30} In reaching its verdict, the trial court, as the trier of fact, was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. Although the trial court could have reasonably found in Richardson's favor, we cannot conclude, given the Supreme Court's holding, that trial court "lost its way" when it found Richardson guilty of OVI and child endangering.

{¶ 31} Richardson's assignment of error based on manifest weight is overruled.

### III. Conclusion

{¶ 32} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

TUCKER, J., concurring in judgment only.

HALL, P.J., concurring:

{¶ 33} I agree that Clinton Richardson's conviction for driving under the influence of hydrocodone is not against the manifest weight of the evidence.

{¶ 34} I write separately to again express my disagreement with the extensive quote from *State v. May* in paragraph 21 of the lead opinion. I do so not only because I disagree with it but also because, in my view, the Supreme Court's decision in this case

effectively overruled that portion of *May*.

{¶ 35} In *May*, I concurred based on the overwhelming evidence of impairment by alcohol intoxication, but I wrote then:

> * * * I write separately to express my disagreement with the following sentence: "We agree with [appellant] that, when a prosecution under R.C. 4511.19(A)(1)(a) is based on driving under the influence of medication, the State must do more than simply present evidence that the defendant has taken the medication and shows signs of impairment." (supra ¶ 46). And I disagree with the determination that "in order to establish a violation of R.C. 4511.19(A)(1)(a) based on medication, the State must also present some evidence (1) of how the particular medication actually affects the defendant * * * and/or (2) that the particular medication has the potential to impair a person's judgment or reflexes." (supra ¶ 48). Neither comment is necessary to our disposition of this case because we conclude that "[t]he State presented overwhelming evidence that May drove her vehicle while under the influence of alcohol." (supra ¶ 54). With that conclusion, discussion of the evidence required to show impairment by medicine or drugs is dicta. Moreover, I don't agree with either quoted statement. It just depends.

*May,* 2014-Ohio-1542, at ¶ 57 (Hall, J., concurring).

{¶ 36} In the Supreme Court's decision in this case, the previously-quoted dicta passage from *May* was rejected. The Supreme Court stated: "When the effects of a drug are sufficiently well known—as they are with hydrocodone—expert testimony linking ingestion of the drug with indicia of impairment is unnecessary." *Richardson*, 2016-Ohio-

8448, at ¶ 19. In addition, the Supreme Court noted that there was lay testimony connecting Richardson's impairment to hydrocodone. *Id.*   Moreover, the Supreme Court quoted and embraced my statement in our initial *Richardson* decision that " '[o]n this record, where it is undeniably apparent that the defendant was substantially impaired because he had taken pain killers, more specifically hydrocodone, I do not believe it was necessary to introduce evidence of the pharmaceutical properties of what he ingested to find him guilty of driving under the influence.' " *Id.* at ¶ 8, quoting *State v. Richardson*, 2015-Ohio-757, 29 N.E.3d 354 (2d Dist.), ¶ 36 (Hall, J., dissenting).

{¶ 37} In my view, the dicta from *May* quoted in paragraph 21 of the majority opinion is not the law in Ohio.

. . . . . . . . . .


Copies mailed to:

Andrew T. French
Kristin L. Arnold
Hon. Barbara P. Gorman