[Cite as *State v. Taylor*, 2019-Ohio-142.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-9 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-566 |
| | : | |
| PIERRE R. TAYLOR | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of January, 2019.

. . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Second Floor, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

KAREN S. MILLER, Atty. Reg. No. 0071853, P.O. Box 341274, Beavercreek, Ohio 45434
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** This matter is before the Court on Pierre Taylor's March 13, 2018 Notice of Appeal. Taylor appeals from his March 9, 2018 conviction on multiple charges following a jury trial. We hereby affirm the judgment of the trial court.

**{¶ 2}** On October 9, 2017, Taylor was indicted as follows: Count 1, aggravated burglary, in violation of R.C. 2911.11(A)(1) (with purpose to commit domestic violence), a felony of the first degree; Count 2, carrying a concealed weapon, in violation of R.C. 2923.12(A)(1), a felony of the fourth degree; Count 3, carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), a felony of the fourth degree; Count 4, domestic violence, in violation of R.C. 2919.25(C), a misdemeanor of the first degree; Count 5, aggravated menacing, in violation of R.C. 2903.21(A), a misdemeanor of the first degree; Count 6, assault, in violation of R.C. 2903.13(A), a misdemeanor of the first degree; and Count 7, domestic violence, in violation of R.C. 2919.25(A), a felony of the third degree. The indictment also contained a forfeiture specification for a Hi-Point handgun.

**{¶ 3}** Taylor entered pleas of not guilty on October 20, 2017. Seven days later, he filed a "Plea of Not Guilty by Reason of Insanity (NGRI)" and a motion for a competency evaluation. On November 1, 2017, the court ordered a forensic evaluation of Taylor.

**{¶ 4}** Taylor filed a "Motion to Suppress Search Evidence and Statements" on November 2, 2017, and a motion for a bill of particulars a few days later. On November 17, 2017, the State filed a bill of particulars specific to each count in the indictment.

**{¶ 5}** On November 22, 2017, Taylor filed a motion to dismiss Counts 1 and 4, arguing that the victim therein, C.T., Taylor's ex-wife, was not a family or household member. Taylor attached a lease in his name to property located at 412 Wallace Drive,

as well as an affidavit of Rhonda Hoskins, a person who had known Taylor for several years. Hoskins's affidavit stated that Taylor resided at 412 Wallace Drive and was divorced from C.T. On November 28, 2017, the State responded to the motions to suppress and dismiss.

{¶ 6} On November 30, 2017, Taylor filed a second motion to dismiss, seeking the dismissal of Count 7 in the indictment, of which B.W. was the victim. According to Taylor, he was not a family or household member of B.W. at the time of the domestic violence alleged in Count 7. On December 5, 2017, the court filed an entry stating that factual issues relevant to dismissal were not "fit for pretrial disposition" and that these issues would be addressed "after the conclusion of the State's presentation of evidence" by means of a Crim.R. 29 motion.

{¶ 7} On December 20, 2017, the trial court held a hearing regarding Taylor's competency. At the hearing, the parties stipulated to the contents of a report provided to the court by the Forensic Psychiatry Center for Western Ohio, and the court found Taylor competent to proceed to trial.

{¶ 8} On December 21, 2017, defense counsel filed a motion to withdraw, asserting that communications between defense counsel and Taylor had been "irrevocably broken." On January 8, 2018, Taylor filed a "Motion to Preserve Police Camera Recordings and to Provide to the Defendant," and the court granted that motion.

{¶ 9} On January 25, 2018, the trial court held a hearing on defense counsel's motion to withdraw, and the court granted the motion. On February 7, 2018, the court held a hearing on Taylor's motion to suppress, and the court overruled the motion.

{¶ 10} Trial commenced on February 20, 2018. The evidence presented was as

follows:

{¶ 11} Captain Steve Holcomb of the Fairborn Police Department testified that he was on duty on September 26, 2017. At 7:12 p.m., he was dispatched to a specific apartment at the Fairborn Apartments on Wallace Drive on a report of Taylor fighting with the occupants and indicating that he was in possession of a knife. While en route, Holcomb learned that Taylor had left the address to retrieve a gun. Holcomb then received a report that Taylor had discharged the weapon at the end of Williams Street, near Baker Junior High School. Upon arrival to the area, Holcomb indicated that he did not see Taylor, with whom he was familiar, and he obtained Taylor's address from dispatch. Holcomb proceeded to Taylor's address, which was 412 Wallace Drive.

{¶ 12} Holcomb stated that he observed two men inside Taylor's residence through a window, and that one of them opened the door when he knocked. Holcomb stated that he asked for Taylor; Taylor exited the apartment and denied living there and knowing who did. Holcomb stated that Taylor was then detained and placed in a cruiser.

{¶ 13} Police Officer Ethan Boggs of the Fairborn Police Department testified that he was dispatched to an apartment on Wallace Drive on September 26, 2017, and that he was familiar with Taylor. Boggs stated that, when he and Officer Hood arrived, witnesses outside pointed in Taylor's direction. Boggs stated that he proceeded to 412 Wallace Drive and provided cover for Holcomb as Holcomb spoke to Taylor. After Taylor was placed in the cruiser, Boggs proceeded to the apartment to which Holcomb had originally been dispatched and spoke to the victim. He testified that he then returned to 412 Wallace Drive to secure the scene until a warrant was obtained.

{¶ 14} Fairborn Police Officer John Hood testified that he also responded to 412

Wallace Drive, and that when Taylor emerged from the apartment, Hood placed him in handcuffs and conducted a pat down search for officer safety. Hood testified that Taylor advised him that he had a knife in his front pocket, and Hood retrieved it. Hood stated that the knife was black with a wooden part on the handle. Hood identified the knife as State's Exhibit 6.

{¶ 15} Fairborn Police Officer Christopher Sopher testified that he assisted Holcomb and Boggs in securing 412 Wallace Drive. He stated that no one else was inside the residence. Sopher testified that he and Boggs then proceeded to the residence of C.T. and her family. He stated that Boggs spoke to C.T., and that he spoke to C.B., who also resided there with C.T. Sopher identified State's Exhibits 26 and 27 as photographs taken by him of C.B.'s face, neck and arms after C.B. reported that Taylor grabbed her around her neck and arms and cut her arm.

{¶ 16} Taylor stipulated to two prior domestic violence convictions in Xenia Municipal Court in Case Nos. 2009 CRB 00904 (misdemeanor of the fourth degree) and 2010 CRB 00862 (misdemeanor of the first degree) as follows:

THE COURT: * * *

It's my understanding there's a possibility of a stipulation you'd like to place on the record?

MS. STOUT: Your honor, yes, Mr. Taylor has previously been convicted of domestic violence in Xenia Municipal Court Cases 09 CRB 00904 and 10 CRB 00862.

It's my understanding he may be willing to stipulate to those prior convictions, which do qualify as offenses of violence.

THE COURT: Counsel?

MR. ROBINSON: No objection, your Honor.

THE COURT: Is that what you'd like to do, Mr. Taylor? That precludes presentation of evidence. In other words, officers don't have to come - -

DEFENDANT PIERRE TAYLOR: Yes, sir.

THE COURT: - - in and say it was you that were involved and sort of thing - -

DEFENDANT PIERRE TAYLOR: Yes, sir.

THE COURT: - - that's the only, that's the only difference there. The Jury still has to make the determination whether you've been convicted or not. This is just not a requirement that evidence be presented. That's what a stipulation is.

DEFENDANT PIERRE TAYLOR: I understand.

{¶ 17} Detective Alan Kraker of the Fairborn Police Department then testified that after speaking to the victims, he observed and retrieved a shell casing from a sidewalk across from 335 Williams Street, in the area where Taylor reportedly fired his weapon. Kraker testified that the casing was submitted to the Bureau of Criminal Investigation of Ohio ("BCI"). He identified the .380 caliber spent casing. Kraker testified that he drafted, obtained, and executed a search warrant for 412 Wallace Drive. In the course of the search, he stated that he found a Hi-Point semi-automatic handgun in the living room of the residence, hidden underneath a brown cushion on the floor near the front door. He stated that it contained a live bullet. Kraker stated that he also found unspent

.380 caliber bullets, and letters and a Dayton Power & Light bill bearing Taylor's name. He identified photographs taken in the course of his search, and a video of the search was played for the jury.

{¶ 18} Fairborn Police Officer Christopher Helman testified that he tested a Hi-Point semi-automatic handgun connected to Taylor's case and prepared an operability report concluding that the weapon was operable. Detective Kraker, who was also an evidence technician, testified that before Helman performed the operability test on the weapon, Kraker swabbed the gun, magazine and bullets for "touch DNA." He also obtained a DNA sample from Taylor. Kraker stated that he interviewed Taylor on September 28, 2017 and recorded the interview. A recording of the interview was played for the jury.

{¶ 19} Heather Williams testified that she was employed at BCI as a forensic scientist assigned to the firearms sections of the London laboratory facility. The court qualified Williams as an expert witness in the area of forensic science involving ballistics and tool mark examination. She identified the report of her scientific findings that she prepared after examining and test-firing the weapon found at Taylor's residence. Williams testified that the shell casing that was submitted to her, Exhibit 46, which Kraker found on the sidewalk, had been fired by the Hi-Point firearm that she tested.

{¶ 20} C.T. testified that she resided at the Fairborn Apartments with her four children, including B.W., who was 16 at the time of trial, and C.B., who C.T. "took in * * * after she got out of foster care." C.T. testified that Taylor was her ex-husband; they were married in 2013 and divorced in 2016. She stated that they were married at the courthouse in Wilmington, Ohio because at the time she, Taylor and her four children

were living there with her stepfather. Five weeks after the wedding, C.T. stated that she, Taylor, and all of her children moved to West Union. C.T. also stated that she, Taylor, and her four children had resided together with her grandmother in Peebles, Ohio during her marriage.

{¶ 21} C.T. testified that, on September 26, 2017, while she was in the shower, C.B. and B.W. entered the apartment crying. C.T. got out of the shower, and C.B. and B.W. told her that Taylor "was drunk and had choked [C.B.] and pushed [B.W.] down." C.T. testified that she heard Taylor yelling and went outside to talk to him. She stated that Taylor began yelling at her, and that her fiancé Dwayne Ellington then came outside from the apartment to try to calm Taylor down. When Ellington and C.T. returned to the apartment, Taylor followed. C.T. tried to shut the door, but Taylor's "foot stopped it" at the bottom of the door so that she could not close it. C.T. testified that she "kept walking toward [her] bedroom, getting the kids back to [her] room," and that Taylor pushed the door open and followed her inside. C.T. testified that she did not give Taylor permission to enter the apartment. According to C.T., she "told Dwayne that [Taylor] was in the apartment, because [Dwayne] was in the bedroom. So Dwayne was behind me, and I was kind of in the middle." C.T. stated that Taylor was "[t]rying to fight with Dwayne."

{¶ 22} C.T. testified that she could see Taylor's left hand, but his right hand was behind his back. C.B. told C.T. that Taylor had a knife in his right hand. C.T. testified as follows:

> [PROSECUTOR] Q. * * * So he's got a knife in his right hand. It's behind his back (Indicating.) What is he saying when all this is going on?
>
> A. I don't know.

Q.   Is he still upset?

A.   Yes.

Q.   * * * Is he saying anything about the knife itself?

A.   No.

Q.   Was he saying anything that caused you to think that he might harm you or the kids or Dwayne?

A.   Yes.

Q.   And what was that?

A.   That he would kill everybody in my apartment.

Q.   * * * Did he say how he was going to do that?

A.   He was going to get his gun.

Q. * *   Did you believe him that he was going to go get his gun?

A.   Yes.

Q.   * * * How does it end in your apartment?   Does he stay there? Does he leave?

A.   Once I found out he had the knife, I started talking to him to get him out of the apartment.

{¶ 23}  C.T. stated that she eventually observed the knife, and that it was open. C.T. stated that C.B. tried to get the knife away from Taylor but was unable to do so. C.T. testified that C.B. received a scratch on her arm in the process.   C.T. testified that she and Taylor went outside of the building, and that Taylor then left and did not return. C.T. testified that she called 9-1-1, believing that she and her children were in imminent danger.

{¶ 24} A recording of C.T.'s 9-1-1 call was played for the jury (State's Ex. 1.). The following exchange occurred regarding the recording, as it was played:

**BY [THE PROSECUTOR]:**

Q.  Can you hear that voice, [C.T.]?

A.  Yes.

Q.  And whose voice is that, please?

A.  That's my voice.

* * *

Q.  [C.T.], why are you saying he just shot the gun?

A.  Because he fired the gun.

Q.  Were you able to hear that?

A.  Yes.

Q.  Were you able to see him, though?

A.  No.

* * *

Q.  * * * Was it from the direction that you had seen him head?

A.  Yes.

* * *

Q.  Who were you talking to?

A.  [C.B. and B.W.]

Q.  Why were you talking to them?

A.  Because they were trying to come outside.

Q.  Were you worried about that?

A.  Yes.

* * *

[DEFENSE COUNSEL]:  Your Honor, can I approach?

* * *

**AT BENCH** [outside the hearing of the jury]**:**

[DEFENSE COUNSEL]:  I'd like the Jury to disregard the portion [related] to sobriety whether he was intoxicated or not, as this person has not been relayed [sic] that the State has called or that I plan to call, so there's no way for this person to confirm whether or not my client was under the influence of anything that night.

[PROSECUTOR]:  I have not asked her full questions.  She's indicated that at least he was intoxicated.  I don't have any problems striking the cocaine, but I believe all the information so far has been that he was possibly intoxicated.  I can ask her a follow-up question after that.

THE COURT:  Well, is there going to be any evidence he may have taken cocaine?

[PROSECUTOR]:  No.

THE COURT:  * * *  So you want me to tell the Jury to disregard?

[DEFENSE COUNSEL]:  Yeah, anything to the use of cocaine.

* * *

OPEN COURT:

THE COURT:  Ladies and gentlemen, you just heard a statement made in this exhibit regarding the use of cocaine.

There will be no evidence presented in this case there was any cocaine usage at all. You are instructed to disregard that statement. * * *

* * *

**BY [PROSECUTOR]:**

Q. [C.T.], regarding the information about him being intoxicated, what was your impression of him when you were dealing with him that day?

A. That he was intoxicated.

Q. And you have seen him previously intoxicated?

A. Yes.

{¶ 25} At the conclusion of the 9-1-1 recording, C.T. testified that it was a fair and accurate copy of the call she made that evening. Regarding when she heard the gunshot referred to in the call, C.T. testified that she observed Taylor walking down Williams Street until she lost sight of him, and that she heard the gun shot "a few seconds" later. C.T. identified the knife that Taylor carried into the apartment.

{¶ 26} The prosecutor also played two recorded phone calls made from the jail between C.T. and Taylor (State's Exhibits 44 and 45). Defense counsel objected as follows:

MR. ROBINSON: I've got a problem with the calls coming in, because, I mean, despite the conversations that took place, there's no force. There's no coercion. There's no intimidation that takes place during any of those calls that I have, so whether it's consciousness of guilt, I think that's a Jury - - that's a question for the Jury.

{¶ 27} The court allowed the tapes to be played. C.T. testified that, in the course

of the conversation recorded as State's Exhibit 44, Taylor asked her not to come to court to testify and "[n]ot to tell them that he came in the apartment." In addition to Taylor's voice, C.T. identified her fiancé's voice on the recording, and she testified that Taylor asked him "[n]ot to let us get subpoenaed to court." C.T. also identified C.B.'s voice on the recording.

{¶ 28} C.T. also identified her voice and Taylor's on State's Exhibit 45. She testified that in the course of that call, Taylor asked her to "say he never lived with me." C.T. stated that Taylor asked her "[w]ho all wrote statements on him" and asked her not to answer her door on the first day of trial.

{¶ 29} On cross-examination, C.T. identified a written statement she gave to the police in which she indicated that Taylor "kicked open my door and entered walking into my hallway with a knife threatening me." C.T. acknowledged that kicking the door and blocking it are different actions. After C.T. refreshed her memory by reading an incident report prepared by Boggs, she acknowledged that she told Boggs that Taylor never threatened her with a knife on September 26, 2017.

{¶ 30} On redirect examination, when asked what she meant when she indicated that Taylor kicked her door, C.T. responded, "[p]utting his foot in the door. I didn't mean, like, kicked (Indicating) it in."

{¶ 31} C.B. testified that she was 19 at the time of trial, that C.T. was her "mom," that B.W. was her "sister," and that she resided with them. She testified that, on September 26, 2017, she and B.W. were walking around the Fairborn Apartments and observed Taylor arguing with "these guys" in the middle of Williams Street. She stated that Taylor began calling her and B.W. names and threw a Hennessy glass bottle at them

that broke on the sidewalk. She testified that "we didn't even say anything to him. We were just minding our own business walking." C.B. testified that "at some point when he was calling us names, he put his hand around my throat and said - - I don't remember what he said exactly, and then he pushed [B.W.] down on the ground." She stated that he pushed B.W. "[j]ust with one hand." She stated that she was worried when Taylor's hand was around her throat, because if he "put force into it" he could "make me not breathe."

{¶ 32} C.B. stated that she and B.W. ran home "and started yelling for our mom." Taylor followed them, and they heard him yelling outside of the apartment building. C.B. testified that she was standing behind Taylor when he pulled out the knife inside the apartment, and that she tried to grab it from his hand. C.B. testified that her arm was cut in doing so. C.B. testified that the knife was open and that Taylor was waving it around. According to C.B., Taylor said he "was going to shoot up our house." She stated that C.T. eventually got Taylor out of the house and that he left to get his gun. She identified the photos of her neck and the cut on her arm, as well as the knife. On cross-examination, C.B. identified her written statement to police. She acknowledged that therein she did not describe an altercation inside the apartment or indicate that Taylor brandished a knife and threatened to use a gun.

{¶ 33} Dorothy Blaylock testified that she resided at the Fairborn Apartments, and that B.W. was her friend; Blaylock did not know Taylor. She stated that she went to C.T.'s apartment on September 26, 2017, and that when she arrived she saw "two guys arguing." Blaylock stated that one of them, known to her as Taylor by the time of trial, had "long braids or dreads," and that he "ended up leaving, and then he came back."

Blaylock testified that the man she observed went into the building, and then when he came back out, "I see that he drops a gun" in the grass. She stated that when he initially returned, she did not observe a firearm when he entered or exited the building. Blaylock stated that, after dropping the gun in the grass, Taylor "pick[ed] it back up, and he ke[pt] on walking." She stated that the weapon was a handgun. On cross examination, Blaylock stated that both men involved in the altercation "had braids or dreads," and that she "wasn't very close" to them.

{¶ 34} After a brief recess, the court indicated that for scheduling purposes defense counsel wanted to call C.T. in his case. Defense counsel requested that B.W., who was present in the courtroom, be removed. The prosecutor indicated to the court that she was not going to call B.W., "because I don't think she's capable of testifying without breaking down." The court indicated that "it's pretty much a moot point at this juncture because she's not going to [be] testifying." The State indicated as follows: "To be fair, the State has gotten whatever we needed as far as her testimony out through other witnesses as far as being pushed down and living - - you know, prior spouse/child living together. All that's in the record already." Defense counsel then proceeded to question C.T. without objection.

{¶ 35} Marjorie Kulp, a forensic scientist in the biology and DNA section of BCI, was qualified her as an expert regarding DNA analysis. In her testimony, she identified the report she prepared after she analyzed the DNA swabs from the firearm retrieved from Taylor's residence. Kulp testified that she found Taylor's DNA on the firearm. She stated that she could not reach any conclusions from the swab of the knife blade.

{¶ 36} After the State rested, defense counsel made a motion for acquittal on the

domestic violence charges on the basis that neither C.T. nor B.W. had a "familial relationship" with Taylor for purposes of committing domestic violence; the court denied the motion. The court granted Taylor's Crim.R. 29 motion as to Count 3, carrying a concealed weapon.

{¶ 37} Prior to closing arguments, the court instructed the jury that "closing arguments are not in and of themselves evidence. The evidence that you'll decide the case is now completed before closing arguments."

{¶ 38} In the State's closing argument, the prosecutor indicated to the jury as follows regarding the recorded phone calls from the jail:

* * * Why does he ask these things? Why does he say these things repeatedly on these phone calls? Because he knows he's guilty.

He knows that he committed those acts, and that's the only way he can get out of that is to get her not to come to court; have the kids not come to court; for her to say he was never in that apartment; that he never threatened them; that - - you know. All those things that you hear on those phone calls.

That goes to his consciousness of guilty [sic]. There's only one reason to have those conversations, to have those phone calls and that's to get out of trouble because you know you've done something wrong.

{¶ 39} In further instructing the jury, the court advised that closing arguments "are designed to assist you. Again, they are not evidence." The court also instructed the jury as follows, without objection, regarding the recorded phone calls from the jail:

Testimony has been admitted in this case indicating that the

Defendant had telephone conversations regarding these allegations with [C.T.], a witness in this case.

You are instructed the Defendant's statements alone do not raise a presumption of guilt; but it may tend to indicate the Defendant's consciousness of guilt.

If you find that the facts do not support that the Defendant had conversations with [C.T.], or if you find that some other motive prompted the Defendant's conduct, or if you're unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose whatsoever.

However, if you find the facts support that the Defendant engaged in such conduct, and if you decide that the Defendant was motivated by a consciousness or awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the Defendant is guilty of any of the crimes charged.

**{¶ 40}** On February 21, 2018, the jury found Taylor guilty of aggravated burglary (with purpose to commit domestic violence), carrying a concealed weapon (knife), two counts of domestic violence, aggravated menacing, and assault. It also found that the Hi-Point handgun was subject to forfeiture.

**{¶ 41}** On February 27, 2018, Taylor filed a pro se motion for a new trial. The following day, the State filed a sentencing memorandum recommending an aggregate sentence of ten years. On March 2, 2018, counsel for Taylor filed a "Motion to Set Aside Verdict or a New Trial." The State responded to defense counsel's motion on March 9,

2018.

{¶ 42} On March 9, 2018, the court sentenced Taylor to nine years for aggravated burglary (Count 1); one year for carrying a concealed weapon (Count 2); 180 days for assault (Count 6); and 3 years for domestic violence (Count 7), all to be served concurrently for an aggregate term of nine years. The court did not impose sentence for Count 4 (domestic violence) and Count 5 (aggravated menacing), having noted that "Counts 4 and 5 are allied offenses; and, therefore, the State's indicated they wish to go forward on Count 1, so the Court will move accordingly." The court indicated that it would consider the pending motions "in very short order."

{¶ 43} On March 12, 2018, Taylor filed a pro se "Motion for New Trial"; defense counsel filed a notice of appeal the following day. The State filed a response to the motion for a new trial on March 15, 2018. On March 27, 2018, the court issued an entry that stated that it would not consider Taylor's pro se motions since he was represented by counsel, and the court denied defense counsel's "Motion to Set Aside Verdict or a New Trial."

{¶ 44} Taylor asserts five assignments of error on appeal. For ease of analysis, we will first consider Taylor's third assignment of error.[1] It is as follows:

> DEFENDANT'S CONSTITUTIONAL RIGHTS WERE VIOLATED
> WHEN HE WAS CONVICTED OF DOMESTIC VIOLENCE UNDER AN
> UNCONSTITUTIONALLY OVERBROAD STATUTE, TO WIT, O.R.C. §
> 2919.25 WHEREIN A FAMILY MEMBER IS DEFINED AS A FORMER

---

[1] We note that this assignment of error is initially identified as Taylor's third assignment of error, but it is subsequently identified as his fourth assignment of error in the body of his brief.

SPOUSE OR A CHILD OF A FORMER SPOUSE WITHOUT REGARD TO WHETHER OR NOT THE INDIVIDUALS LIVED TOGETHER OR HOW LONG THEY HAVE BEEN SEPARATED.

{¶ 45} This assignment of error involves C.T., Taylor's ex-wife, and B.W., C.T.'s daughter and Taylor's former step-daughter.

{¶ 46} R.C. 2919.25(F) provides in part:

(1) "Family or household member" means any of the following:

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or *a former spouse of the offender*;

* * *

(iii) A parent or *a child of a* spouse, person living as a spouse, or *former spouse of the offender*, * * *

(Emphasis added.)

{¶ 47} "All statutes enacted in Ohio are presumed to be constitutional. * * * A party challenging the constitutionality of a statute bears the burden of proving beyond a reasonable doubt that the statute is unconstitutional. * * *." *State v. Turner*, 192 Ohio App.3d 323, 2011-Ohio-393, 949 N.E.2d 57, ¶ 16.

{¶ 48} Taylor did not challenge the constitutionality of the definition of family or household member in the trial court but only argued that C.T. and B.W. did not meet that definition. "Failure to object waives all but plain error." *State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.). Crim.R. 52(B) provides: "Plain

errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

**{¶ 49}** This Court has further noted:

Plain error exists when there is error, the error is an obvious defect in the proceedings, and the error affects substantial rights. *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Plain error does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been different. *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. A court recognizes plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

*State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 113 (2d Dist.).

**{¶ 50}** We conclude that plain error is not demonstrated. As the State asserts, the " 'overbreadth' doctrine has application where a regulation or law impermissibly affects First Amendment protections."  *State v. Taubman*, 78 Ohio App.3d 834, 845, 606 N.E.2d 962, (2d Dist.1992). The "overbreadth doctrine is inapplicable to criminal statutes outside the First Amendment context. * * *."  *Springfield v. Pullins*, 130 Ohio App.3d 346, 356, 720 N.E.2d 138 (2d Dist.1998).  Taylor has failed to establish that R.C. 2915.25(F) is unconstitutional beyond a reasonable doubt.  Since plain error is not demonstrated, Taylor's third assignment of error is overruled.

**{¶ 51}**  We will next address Taylor's second assignment of error, which contains seven subparts.  We note that subpart six is duplicative of subpart two, and subpart

seven is duplicative of subpart three. Taylor's second assignment of error is as follows, without the duplicative subparts:

APPELLANT WAS DENIED DUE PROCESS OF LAW AS GUARANTEED BY THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 1, § 10 OF THE OHIO CONSTITUTION FOR THE FOLLOWING REASONS:

1) Counsel was ineffective when he failed to properly object to hearsay and failed to object to the use and admission of reco[r]ded conversations that were not properly authenticated;

2) When the judge improperly instructed the jury that they could rely upon defendant's statements in recorded conversations with [C.T.] as a consciousness of guilt;

3) When the prosecutor improperly referred to the recorded conversation and suggested that the jury could infer defendant's consciousness of guilt from the conversations he had with [C.T.];

4) When he was denied the right to confront his accuser, [B.W.], as to count VII in the indictment, Domestic Violence, as she did not testify at trial;

5) When evidence was improperly admitted and played for the jury where its prejudicial value outweighed it[s] probative value in violation of Rule of Evid.R. 403(B).

<u>The 9-1-1 Call</u>

**{¶ 52}** Taylor argues that the "prosecuting attorney marked State's Exhibit 1, the 9-1-1 call, and then proceeded to play it for the witnesses and the jury without properly

laying a foundation prior to playing it." According to Taylor, "no chain of custody was established; no witness was brought forth to establish that the recording was in fact made during the regular course of business; or that the recording had not been altered." He argues that a proper evidentiary foundation was not laid as required by Evid.R. 901. Further, Taylor asserts that the use of the 9-1-1 call was highly prejudicial to him, that the prejudice outweighed the probative value, and that the call should also not have been admitted pursuant to Evid.R. 403(A). He argues that "there was no need to play the call as [C.T.] could have testified to its contents. The only plausible reason to play the recording was to illicit emotion and possibly outrage from the jury by hearing her voice." Taylor also asserts that the jury heard that he was intoxicated and had used cocaine, which "served to confuse the jury and was highly prejudicial." While defense counsel objected to those statements, and the judge instructed the jury to disregard them, Taylor argues that "it is not known whether or not [the jury] relied upon them in convicting" him.

{¶ 53} Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(B) provides: "Although relevant, evidence *may* be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." (Emphasis added.) As this Court has noted:

> "The distinction between mandatory and discretionary exclusion in
> Rule 403 may ultimately prove to be elusive in application. It should be
> noted that in regard to both types of exclusion, the trial judge must
> determine that the adverse effect 'substantially' outweighs the probative

value of the evidence. The word 'substantial' is undoubtedly a word of some elasticity, and ultimately in applying that standard, the trial judge has broad discretion. While it is conceivable that a reviewing court might frame the issue differently depending upon whether mandatory exclusion or discretionary exclusion is at issue, the discretion of the judge in applying either Rule 401(A) or (B) is extensive." Weissenberger, Ohio Evidence Treatise (1998) 81, Section 403.2. See also, e.g., *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66.

*State v. Lloyd,* 2d Dist. Montgomery No. 15927, 1999 WL 173017, * 14 (March 31, 1999).

{¶ 54} Evid.R. 901 provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

{¶ 55} We initially conclude that defense counsel's failure to object to the admission of the 9-1-1 call waives all but plain error. We further conclude that C.T. properly authenticated her own voice on the 9-1-1- call. She testified that the recording was a true and accurate copy of the call she placed after Taylor left her apartment. Defense counsel successfully objected to the reference to Taylor's cocaine use in the call; the trial court instructed the jury to disregard the evidence of cocaine use, and a jury is "presumed to follow curative instructions given by the trial court." *State v. Howard*, 2d Dist. Montgomery No. 20575, 2015-Ohio-3702, ¶ 43. Further, we have listened to the recording, and we conclude that its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, as Taylor asserts. The recording is consistent with C.T.'s and C.B.'s testimonies regarding the

incident. They described Taylor's conduct in the apartment, and C.T. testified that she heard a gunshot but did not see Taylor fire the weapon. Finally, we cannot conclude that the probative value of the brief 9-1-1 call was substantially outweighed by considerations of undue delay or the needless presentation of cumulative evidence. We see no plain error in the admission of Exhibit 1.

<u>Taylor's and C.T.'s Recorded Conversations from Jail</u>

{¶ 56} Taylor further asserts that State's Exhibits 44 and 45 "were played for the jury without proper foundation or an appropriate witness to authenticate the recordings." He argues that trial counsel was ineffective and "failed to object to the recordings being played for lack of a proper foundation and authentication. The jail utilizes a third party, IC Solutions, to record all jail telephone calls. No witness from IC Solutions was brought in to authenticate these telephone calls." Taylor again argues that C.T. "could have testified as to the contents of the recordings" without the necessity of playing the recordings. Taylor asserts that, in the recording, he "discusses the fact that he believes he is being charged as a repeat violent offender and facing 40 or 50 years or the rest of his life in prison. All of these statements [were] highly prejudicial to defendant and serve[d] no probative value to the State in proving the charges for which defendant was indicted." Taylor further argues that he was not charged with "any crime relevant to these statements; thus, the only reason to play the recordings for the jury [was] once again to appeal to their emotion or cause confusion or mislead the jury and to try to admit 'testimony' of defendant when in fact he did not take the stand." He asserts that defense counsel "failed to argue that they did not tend to show whether or not defendant was guilty or not guilty and therefore were not relevant in this matter." Taylor asserts that the

admission of the tapes was plain error, and that defense counsel's failure to object to their admission was also plain error, such that "his conviction for aggravated burglary should be reversed."   According to Taylor, "but for the admission of these tapes, he would not have been convicted of aggravated burglary."

**{¶ 57}** As this Court has previously noted:

It is well established that ineffective assistance of counsel affects a substantial right afforded by the United States and Ohio Constitutions. *Strickland v. Washington,* [466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance, and a defendant, in order to overcome the presumption that counsel is competent, must show that counsel's decisions were 'not trial strategies prompted by reasonable professional judgment.' " *State v. Few,* 2d Dist. Montgomery No. 21561, 2012-Ohio-5407, ¶ 10, quoting *Strickland* at 687. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *Id.*at ¶ 11, quoting *State v. Nabors*, 2d Dist. Montgomery No. 24582, 2012-Ohio-4757, ¶ 17. "Even if unsuccessful, strategic decisions will not constitute ineffective assistance of counsel." *Id.,* citing *State v. Carter,* 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Generally, the decision regarding which defense to pursue at trial is a matter of trial strategy, and trial strategy

decisions are not a basis of a finding of ineffective assistance of counsel. *State v. Moss,* 2d Dist. Montgomery No. 22496, 2008-Ohio-6969, ¶ 35, citing *State v. Murphy,* 91 Ohio St.3d 516, 524, 747 N.E.2d 765 (2001); *State v. Dixon,* 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 52[.]

*State v. Dover,* 2d Dist. Clark No. 2013-CA-58, 2015-Ohio-4785, ¶ 10.

**{¶ 58}** Evid.R. 901(B) provides the following illustration as an example of authentication conforming to the requirements of the rule: "(5) Voice Identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." We conclude that C.T. properly authenticated the calls from the jail by identifying her own voice as well as Taylor's. As such, plain error is not demonstrated in defense counsel's failure to object to the admission of Exhibits 44 and 45 due to lack of authentication.

**{¶ 59}** Taylor also asserts that defense counsel was ineffective in failing to object on the basis that the recordings were not relevant, because they did not tend to show that he was guilty or not guilty. However, as discussed below, the court thoroughly instructed the jury regarding its consideration of the recordings and whether or not the recordings demonstrated consciousness of guilt. We see no plain error in defense counsel's failure to object on this basis. We also note that defense counsel acknowledged that "whether it's consciousness of guilt, * * * that's a question for the jury."

**{¶ 60}** We have listened to State's Exhibits 44 and 45. In State's Exhibit 44, Taylor asserts that he is facing 40-50 years or the rest of his life in prison based upon a

repeat violent offender specification to a domestic violence offense. He encourages C.T. to speak to his attorney, and regarding the witnesses to the incident, he instructs C.T.'s fiancé, "don't let them get subpoenaed," and "keep them on deck." In State's Exhibit 45, Taylor instructs C.T. to contact the prosecutor and to tell the prosecutor that he and C.T. never lived together while they were married and that she (C.T.) was not coming to court to testify.

{¶ 61} Regarding Taylor's discussion of a potential lengthy prison term, as noted above, Taylor stipulated to his two prior domestic violence convictions, and he was not charged as a repeat violent offender. Defense counsel did not object on the basis of Taylor's statements regarding his potential prison term, but on the basis that Taylor had not been charged with intimidating C.T. in the course of the calls. Given the overwhelming evidence of Taylor's guilt, any error in the admission of Taylor's statements regarding a potential lengthy prison term was harmless. Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.") We see no plain error in the admission of Exhibits 44 and 45.

Jury Instructions regarding Consciousness of Guilt

{¶ 62} Taylor directs our attention to the trial court's instruction regarding consciousness of guilt. He asserts that: "[t]he question here is whose 'testimony' was the Judge referring to, the defendant's? The defendant did not testify. Was this in essence a way for the prosecution to circumvent Defendant's constitutional right to not incriminate himself and refuse to testify?" He argues that "the jury instructions were highly prejudicial." We note that Taylor failed to object to the instruction on consciousness of guilt, and he again waived all but plain error.

**{¶ 63}** As this Court has previously observed:

Often, it is relevant to show the conduct of the defendant subsequent to the crime, when such conduct indicates a consciousness of guilt, an inconsistence with innocence or the intent with which the act was committed.   1 Wharton's Criminal Evidence (14th Ed. Torcia 1985) Section 149.   For example, false statements, flight following a crime, or interference with witnesses may be relevant evidence which indicates a defendant's consciousness of guilt.   *See, DeVore v. U.S.* (C.A.Ariz.1966) 368 F.2d 396*, U. S. v. Lyon* (C.A.Mo.1978), 588 F.2d 581[,] *cert. denied* 441 U.S. 910 (applying comparable Federal Evidence Rule 403).

*State v. Ward*, 2d Dist. Montgomery No. 9787, 1986 WL 14239, *2 (Dec. 9, 1986).

**{¶ 64}** We conclude that Taylor's argument lacks merit, and that he was not prejudiced by the jury instructions regarding consciousness of guilt. C.T. testified regarding her conversations with Taylor while he was in jail, and we conclude that the "testimony" the court referred to in its instructions is C.T.'s.   After reviewing the record, we conclude that the trial court did not err when it instructed the jury regarding Taylor's statements on the phone calls from the jail.   The evidence established that Taylor attempted to interfere with the witnesses to his offenses, and it was for the jury to decide if Taylor's conduct in doing so indicated consciousness of guilt.   In other words, the instruction was not prejudicial, and plain error is not demonstrated.

<u>Prosecutorial Misconduct</u>

**{¶ 65}** Although not argued in the body of his brief, Taylor appears to suggest in subpart three that the prosecutor engaged in misconduct by suggesting in closing

argument that the jury could infer Taylor's consciousness of guilt from Exhibits 44 and 45.

{¶ 66} As this Court has noted:

In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones,* 90 Ohio St.3d 403, 420, 2000-Ohio-187, 749 N.E.2d 300, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor." ' Id., quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.

*State v. Wilson*, 2d Dist. Montgomery No. 20949, 2005-Ohio-5004, ¶ 24.

{¶ 67} Defense counsel did not object to the prosecutor's remarks, and our review is limited to plain error analysis. In the context of the entire trial, we cannot conclude that Taylor's substantial rights were prejudicially affected by the prosecutor's comments. In other words, we conclude that the jury would have found Taylor guilty absent the remarks by the prosecutor, given the overwhelming evidence of guilt presented. We further note that the trial court twice instructed the jury that closing arguments were not evidence, and

that all of the evidence that was to be considered by them had been presented before closing argument. The jury is presumed to have followed the instructions given by the trial court. We find no plain error.

<u>Denial of Right to Confront Accuser B.W.</u>

{¶ 68} Taylor asserts that B.W. "did not testify at trial and was not subjected to cross examination. Defendant has a constitutional right to confront his accuser and this right may not be dispensed with."

{¶ 69} As noted above, the State indicated to the court that B.W., although present, was unable to testify, and that "the State has gotten whatever [it] needed" through other witnesses with regard to her relationship with Taylor and having been "pushed down" by Taylor. C.B. testified that she observed Taylor push B.W. down to the ground after throwing a glass bottle at the girls and calling them names, and C.B. was subject to cross-examination regarding her testimony. Although B.W. did not testify, the State offered its rationale for her not testifying, and counsel for Taylor did not register any objection. B.W.'s victimization was established through other witnesses, and we cannot say that Taylor was denied due process due to B.W.'s unavailability. Plain error is not established in any respect.

{¶ 70} Having thoroughly considered each subpart of Taylor's second assignment of error and having found his arguments to lack merit, Taylor's second assignment of error is overruled.

{¶ 71} We will next consider Taylor's first assignment of error. It is as follows:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE STATE FAILED TO PROVE

BEYOND A REASONABLE DOUBT EACH AND EVERY ELEMENT OF THE OFFENSES UPON WHICH DEFENDANT WAS INDICTED AND UPON THE BILL OF PARTICULARS PROVIDED BY THE STATE. THEREFORE HE WAS IMPROPERLY CONVICTED OF [EACH OFFENSE].

**{¶ 72}** This Court has held:

"[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery

No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175.

*State v. Richardson*, 2d Dist. Montgomery No. 26191, 2017-Ohio-9229, ¶ 19-20.

<u>Aggravated Burglary (Count 1)</u>

**{¶ 73}** Taylor asserts that "the State failed to prove beyond a reasonable doubt that Defendant committed the offense of Domestic Violence when he allegedly entered the apartment of [C.T.]" He argues that he "did not forcibly trespass into the apartment, nor did he have the specific intent to commit the offense of domestic violence."

**{¶ 74}** According to Taylor, C.T. was "not a family member within the definition of domestic violence; therefore, he could not be convicted of domestic violence and therefore he could not be convicted of aggravated burglary per the jury instructions and the bill of particulars given."

**{¶ 75}** Taylor also asserts that "[a]ny threat to kill everyone was not 'imminent.' " According to Taylor, "it would have taken him several minutes to go home; retrieve a gun; and return; thus, the threat was not imminent."

**{¶ 76}** Taylor argues that the State had to prove that he "had the intention of committing the offense of domestic violence against [C.T.] upon entering the apartment and that he threatened to kill her with a knife in order to convict him of aggravated burglary." Taylor argues that "the State was bound by the bill of particulars," and thus it was necessary for the State to prove beyond a reasonable doubt the elements as stated

in the bill of particulars. He argues that "the jury instructions as to aggravated burglary set forth that the State must prove that defendant intended to commit the offense of domestic violence upon entering the premises, not any criminal act, but domestic violence." Further, Taylor argues that he did not "kick the victim's door open and enter the residence" as indicated in the bill of particulars, and that accordingly there was no use of force. Finally, Taylor asserts that the "State "failed to prove beyond a reasonable doubt that he trespassed into the apartment," since he followed C.T. inside and "she never asked him to leave."

{¶ 77} We note that the bill of particulars[2] provided as to Count 1 that Taylor "did, by force, trespass in the victim's apartment with purpose to commit the offense of Domestic Violence against his ex-wife. Defendant kicked open the Victim's door and after entering the residence, threatened to kill the victim with a knife."

{¶ 78} As the State asserts, Crim.R. 33(E)(2) provides that no judgment of conviction shall be reversed because of a "variance between the allegations and the proof thereof, unless the defendant is misled or prejudiced thereby."

{¶ 79} R.C. 2911.11 proscribes aggravated burglary and states:

(A) No person, by force * * * shall trespass in an occupied structure * * *

when another person other than an accomplice of the offender is

present, with purpose to commit in the structure * * * any criminal

---

[2] Crim.R. 7(E) provides: "When the defendant makes a written request within twenty-one days after arraignment but not later than seven days before trial, or upon court order, the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense. A bill of particulars may be amended at any time subject to such conditions as justice requires."

offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 80} " 'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Trespass means to knowingly enter or remain on the premises of another without privilege to do so. R.C. 2911.21(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). " 'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of gravity or duration." R.C. 2901.01(A)(3).

{¶ 81} Finally, R.C. 2919.25 proscribes domestic violence and provides in part as follows: "(C) No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member."

{¶ 82} C.T. testified that Taylor was her ex-husband, with whom she formerly resided. Accordingly, she was a family or household member within the meaning of the domestic violence statute, R.C. 2919.25(F)(1)(a)(i). C.T. stated that Taylor followed her to her apartment, and when she tried to shut the door, his "foot stopped it" so that she was prevented from closing it. C.T. stated that Taylor then pushed the door open and followed her inside. As this Court has previously noted, "R.C. 2901.01(A) does not provide for any measure of the physical exertion that might constitute force, but instead looks to

the purpose for which the physical exertion, however slight, has been employed." *State v. Gregg*, 2d Dist. Champaign No. 91-CA-15, 1992 WL 302438, *3 (Oct. 26, 1992). This Court further noted that if "that purpose is to overcome a barrier against the actor's conduct, whether that barrier is the will of a victim or the closed but unlocked door of a home, the physical exertion employed to overcome the barrier may constitute force." *Id.* C.T. attempted to close the door as a barrier to Taylor's entrance into her apartment, and we conclude that the force element was satisfied by his placing his foot in the door to prevent her from closing it and then pushing it open to gain entry.

**{¶ 83}** C.T. further testified that Taylor entered her apartment without her permission. The jury credited her testimony, and we conclude that trespass therein was established. Additionally, contrary to Taylor's assertion above, C.T. observed a knife in Taylor's hand with an open blade, giving rise to an implicit threat of imminent physical harm from the knife. "A 'threat need not be verbalized; rather the threat can be implied by the offender's actions.' " *State v. El-Hardan*, 2d Dist. Montgomery No. 24293, 2011-Ohio-4453, ¶ 46, citing *State v. Terzo*, 12th Dist. Butler No. CA2002-08-194, 2003-Ohio-5983, ¶ 18.

**{¶ 84}** Finally, according to C.T, Taylor threatened to retrieve his gun and kill everyone in the apartment. Taylor and C.T. lived on the same street. C.T. called 9-1-1 after she and Taylor left the apartment building and reported that he was going to retrieve his gun, and in the course of the call she reported to the dispatcher that she heard a gunshot. She further testified that she heard the gunshot "a few seconds" after she lost sight of Taylor walking away. C.T. testified that she was worried about C.B. and B.W. coming outside of the apartment building in the course of the 9-1-1 call due to Taylor's

conduct. In other words, C.T. feared imminent physical harm. Having thoroughly reviewed the entire record, we cannot conclude that Taylor's conviction for aggravated burglary was against the manifest weight of the evidence.

{¶ 85} In his brief under the section entitled "Aggravated Burglary," Taylor additionally argues that he received ineffective assistance of counsel based upon defense counsel's failure to object to a "leading question" posed to C.T. by the State. We will address this argument, and then we will address whether his remaining convictions were against the manifest weight of the evidence.

{¶ 86} Taylor asserts that, on direct examination, C.T. denied that Taylor said anything to her about the knife he brought into the apartment. He argues that C.T. was "then asked a leading question, to which defense counsel did not object, [namely] 'was he saying anything that caused you to think he might harm you or the kids or Dwayne?' " Taylor argues that C.T.'s "response to the leading question was that Taylor was going to kill everyone in the apartment; however, this does not form the basis for 'imminent harm' as a necessary element of domestic violence, as he did not have a gun with him at the time." Taylor points out that C.T. "did not say that he was going to kill everyone with the knife; in fact, he never threatened anyone with the knife." According to Taylor, "had the prosecutor not asked a leading question, the witness's response *may not* have been that she felt threatened by defendant, as she had just testified that defendant did not threat[en] her." (Emphasis added.) He also asserts that, if defense counsel had objected to the leading nature of the questions, "the witness *may not* have stated that defendant said anything to make her feel as though he might cause her harm."

{¶ 87} We conclude that plain error is not demonstrated. Taylor's argument

regarding what C.T. *may have* said is merely speculative, and we have no basis to conclude that an objection would have altered the outcome of Taylor's conviction on Count 1. C.T.'s testimony and the 9-1-1 recording, which was properly admitted as discussed above, made clear that C.T. believed that Taylor posed an imminent threat of physical harm.

Carrying a Concealed Weapon (Count 2)

**{¶ 88}** Taylor asserts that he "was not prohibited from carrying a knife due to his conviction of domestic violence in Xenia Municipal Court," and that the knife was not a deadly weapon. Taylor asserts that he carried the knife in his pocket and that there was no evidence showing that the knife was used as a weapon while inside his own home or that it was adapted or designed for use a weapon. Taylor relies on Officer Hood's testimony on cross examination "that it was not illegal to have a knife in your own home. He further testified that there was no blood on the knife and no evidence that it was used in any crime."

**{¶ 89}** R.C. 2923.12 provides: "(A) No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following: (1) A deadly weapon other than a handgun." R.C. 2923.11 defines a deadly weapon as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried or used as a weapon." As this Court has previously noted:

The definition of deadly weapon in R.C. 2923.11(A) imposes two requirements of proof. First, the article must be capable of inflicting death. Second, the article must either (1) have been designed or specially adapted

for use as a weapon or (2) [have been] possessed, carried, or used as a weapon. Either alternative branch of the second requirement can be employed to prove the proposition. When use is a factor, the manner of its use and the nature of the instrument itself determin[e] its capacity to inflict death.

*State v. Schooler*, 2d Dist. Montgomery No. 19627, 2003-Ohio-6248, ¶ 21, citing *State v. Deboe*, 62 Ohio App.2d 192, 406 N.E.2d 536 (6th Dist.1997).

**{¶ 90}** C.T.'s and C.B.'s testimonies regarding Taylor's conduct in brandishing the knife proved that Taylor possessed, carried, or used the knife as a weapon, and we further conclude that the manner of Taylor's use of the knife and its nature established its capacity to inflict death. Finally, Hood retrieved the knife from Taylor's pocket, where it was concealed. Having reviewed the entire record, we conclude that Taylor's conviction for carrying a concealed weapon was not against the manifest weight of the evidence.

<u>Domestic Violence (Count 4)</u>

**{¶ 91}** Regarding Count 4, domestic violence against C.T., Taylor argues that the "State failed to prove as alleged in the bill of particulars that defendant returned to [C.T.'s home] with a firearm and threatened to kill everyone in the home and thereby knowingly caused his ex-wife * * * to believe that he would cause imminent physical harm to her or her family in violation of O.R.C. 2919.25(C)." According to Taylor, to "the extent that the State relies upon the fact that defendant indicated that he would return to the apartment with a gun and kill everyone in the apartment, there was no imminent threat of harm as required by the statute." He argues that it would have "taken him several minutes to go home," retrieve the gun, and return.

{¶ 92} The bill of particulars as to Count 4 provided:

At the above date and location, during the events outlined in Count 1 and Defendant later returning with a firearm, at which point he threatened to kill everyone, Defendant did knowingly cause his ex-wife to believe that he would cause imminent physical harm to that family or household member. Defendant has previously been convicted of Domestic Violence in Xenia Municipal Court Case No. 09 CR B 00904 and 10 CR B 00862.

{¶ 93} For the reasons set forth in our analysis of Count 1, we conclude that the evidence established the threat of imminent physical harm. We accordingly conclude that Taylor's conviction for domestic violence in Count 4 was not against the manifest weight of the evidence.

Aggravated Menacing (Count 5)

{¶ 94} Taylor again directs our attention to the bill of particulars, which he asserts "specified that defendant placed [C.B.] in fear when he placed his hand around her neck and that he committed the offense of aggravated menacing in Counts 5 and 7 during the events listed in Count 1 and afterwards. It is believed that the later [sic] pertains to the alleged threat to kill everyone." Taylor asserts that, although C.B. testified that he had a knife, she also testified that he "never said anything to threaten her with the knife." He asserts that C.B. "testified that while in the apartment, Defendant never threatened to harm or kill anyone while in the apartment, which according to the bill of particulars would have formed the basis of the aggravated menacing charge."

{¶ 95} The bill of particulars as to Count 5 provided: "At the above date and location, Defendant did knowingly cause the victim, C.B., to believe that the Defendant

would cause her serious physical harm by placing his hand around her neck and choking her.   Defendant also threatened the victims in Count[s] 5 and Count 7 during the events listed in Count 1 and afterwards."

**{¶ 96}**   R.C. 2903.21(A) provides as follows: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person * * *."   Serious physical harm to persons means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶ 97}** C.B. testified that Taylor put his hand around her throat and that she had been concerned that he could "put force into it and make me not breathe."   The jury clearly credited her testimony.   Having thoroughly reviewed the record, we conclude that Taylor's conviction for aggravated menacing was not against the manifest weight of the evidence.

## Domestic Violence (Count 7)

{¶ 98} Finally, regarding Count 7, domestic violence against B.W., Taylor asserts that he was "denied his constitutional right to confront his accuser." He further asserts that this charge should not have been enhanced to a third-degree felony, "as the stipulated underlying domestic violence convictions were not both first degree misdemeanors under O.R.C. § 2919.25(A) or (B)." According to Taylor, he "could not be convicted of a third degree felony without the State proving that he had two prior convictions under O.R.C. §2919.25(A) or (B)." Taylor argues that, to the extent that Defendant's stipulation to the two prior convictions bars him from now claiming that this offense could not be enhanced, defendant counsel "was ineffective in so stipulating." Taylor further argues that B.W. "could not be considered a family member as defined in the statute for the same reasons previously stated * * * pertaining to the overly broad constitutional definition of family member."

{¶ 99} R.C. 2919.25(A) provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." A "violation of division (A) or (B) of this section is a misdemeanor of the first degree." R.C. 2919.25(A)(2). However, R.C. 2919.25(D)(4) provides: "If the offender previously has pleaded guilty to or been convicted of two or more offenses of domestic violence * * * a violation of division (A) or (B) of this section is a felony of the third degree * * *." By its plain language, R.C. 2919.25(D)(4) does not require the State to prove that the two prior convictions were pursuant to R.C. 2919.25(A) or (B).

{¶ 100} "When a prior conviction elevates a misdemeanor to a felony, 'the prior conviction is an essential element of the crime, and must be proved by the state.' * * *."

*State v. Tate*, 138 Ohio St.3d 139, 2014-Ohio-44, 4 N.E.3d 1016, ¶ 17.

**{¶ 101}** Taylor stipulated to his prior domestic violence convictions. As noted in *Tate* " 'an offender may, and often does, stipulate to a prior conviction to avoid the evidence being presented before a jury.' " *Id.* at ¶ 18, quoting *State v. Gwen*, 134 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, ¶ 14. A "stipulation in law is nothing more than an agreement as to the veracity of a fact in issue. *Black's Law Dictionary* 1550 (9th Ed.2009) defines 'stipulation' as a 'voluntary agreement between opposing parties concerning some relevant point; esp., an agreement relating to a proceeding, made by attorneys representing adverse parties to the proceeding.' " *Tate* at ¶ 19.

**{¶ 102}** Regarding Taylor's ineffective assistance of counsel argument, the discussion in the course of the stipulation makes clear that Taylor understood the effect of the stipulation and agreed to it, and we conclude that ineffective assistance of counsel is not demonstrated. We further have no basis to conclude that a failure to so stipulate would have altered the outcome of the trial on Count 7.

**{¶ 103}** We rejected Taylor's overbreadth argument under the third assignment of error, and we noted that the definition of family or household member in R.C. 2919.25(F)(1)(iii) includes a child of a former spouse of the offender.

**{¶ 104}** Having thoroughly reviewed the entire record, we conclude that the jury reasonably found that Taylor knowingly caused or attempted to cause physical harm to B.W. In other words, Taylor's conviction on Count 7 was not against the manifest weight of the evidence.

**{¶ 105}** Taylor's convictions for aggravated burglary, carrying a concealed weapon, domestic violence as a first degree misdemeanor, aggravated menacing, and

domestic violence as a felony of the third degree were not against the manifest weight of the evidence. Taylor's first assignment of error is overruled.

**{¶ 106}** We will next consider Taylor's fourth assignment of error. It is as follows:

THE JURY ERRED WHEN [IT] FOUND DEFENDANT HAD TO FORFEIT THE FIREARM SPECIFIED AS COUNT THREE OF THE INDICTMENT WAS DISMISSED FOR INSUFFICIENT EVIDENCE AND THE ONLY FELONY THAT COULD HAVE BEEN REFERENCED IN THE FORFEITURE SPECIFICATION WAS COUNT THREE AS IT WAS THE ONLY FELONY THAT RELATED TO A FIREARM.

**{¶ 107}** Taylor maintains that only Count Three contained a forfeiture of firearm specification, and the forfeiture cannot stand insofar as he was acquitted of Count Three. Indeed a Crim.R. 29 motion was granted on Count Three, which alleged carrying a concealed weapon. i.e., a firearm in violation of R.C. 2923.12(A)(2). However, Taylor's argument ignores the fact that the jury returned a verdict of forfeiture. We note the jury was asked to decide this specification without objection.

**{¶ 108}** Significantly, the forfeiture specification was not set forth in and/or limited to Count Three of the indictment. The forfeiture specification was set forth at the end of the indictment and tracked the statutory language of R.C. 2941.1417. In relevant portion, the forfeiture specification stated:

The Grand Jurors further find and specify that a Hi Point handgun, Model CF 380, with magazine and ammunition, serial number P8055999, is an instrumentality used in the commission of felony offenses, related to this indictment, and is subject to criminal forfeiture to the State of Ohio, by and

through the Greene County Prosecutor, for distribution to the Fairborn Police Department for destruction as provided by law under Chapter 2981 of the Ohio Revised Code, and the Defendant has possessory and/or ownership interest.

{¶ 109} Thus, the jury was asked to determine if the firearm was an instrumentality used in the commission of any of the felony offenses that it considered. Importantly, Taylor did not challenge any language of the jury instructions which did or did not describe/define "instrumentality used in the commission of any of the felony offenses."

{¶ 110} Taylor was in fact convicted of three felonies as laid out in the indictment. Furthermore, the evidence elicited established the forfeited weapon had been fired near the scene of all three felonies, and circumstantial evidence established the firearm had been secreted behind a sofa pillow at Taylor's residence. None of these facts were crucial to the dismissal of the carrying a concealed weapon charge, as the witnesses could not attest that Taylor had the gun concealed on his person while he was in her residence. Few places are more convenient than one's own residence for hiding the instrument of felonious conduct.

{¶ 111} Taylor's fourth assignment of error is overruled.

{¶ 112} Finally, we will consider Taylor's fifth assignment error, which is as follows:

DEFENDANT'S RIGHT TO A SPEEDY TRIAL PURSUANT TO O.R.C. §2945.71 WAS VIOLATED WHEN HIS DEFENSE COUNSEL FILED A [PLEA OF] NOT GUILTY BY REASON OF INSANITY AND REQUESTED A COMPETENCE EVALUATION AND A MOTION TO

SUPPRESS, ALL TOLLING EVENTS, AGAINST DEFENDANT'S INSTRUCTION OTHERWISE.

**{¶ 113}** Taylor asserts that "[e]very time Defendant was brought to court for a hearing, he reiterated his desire to have a speedy trial," and he directs our attention to the transcripts of hearings that occurred on December 20, 2017, and January 25, 2018. The State notes that Taylor "does not contend that trial counsel was ineffective for filing these motions, nor does he contend that the motions were frivolous." According to the State, "it is irrelevant whether Appellant consented to trial counsel's motions, especially where he fails to articulate how those motions were baseless or unnecessary."

**{¶ 114}** R.C. 2945.71(C)(2) provides that a person charged with a felony shall be brought to trial within 270 days of arrest. R.C. 2945.71(E) provides that "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." It is undisputed that Taylor was arrested on September 26, 2017, and incarcerated until trial. As noted above, defense counsel's motion for a competency evaluation was filed on October 27, 2017, and his motion to suppress was filed on November 2, 2017. R.C. 2945.72 provides as follows:

> The time within which an accused must brought to trial, or, in the
> case of a felony, to preliminary hearing and trial, may be extended only by
> the following:
>
> * * *
>
> (B) Any period during which the accused is mentally incompetent to
> stand trial or during which his mental competence to stand trial is being
> determined * * *

* * *

(E) Any period of delay necessitated by reason of a * * * motion, proceeding, or action made or initiated by the accused.

**{¶ 115}** We initially note that the "Supreme Court of Ohio has * * * held that 'a defendant's statutory right to a speedy trial may be waived, with or without the defendant's consent, by the defendant's counsel.' " *State v. Deacey*, 2d Dist. Montgomery No. 27408, 2017-Ohio-8102, ¶ 81, quoting *State v. King*, 70 Ohio St.3d 158, 637 N.E.2d 903 (1994). We further note that, at the January 25, 2018 hearing on then-defense counsel's motion to withdraw, Taylor asserted, regarding the motion to suppress, that "it's filed now, and we're going on with it now."

**{¶ 116}** Taylor's motion to suppress was overruled on February 9, 2018. We agree with the State that Taylor's "speedy trial clock was only running between September 26, 2017 and October 27, 2017, as well as February 9, 2018 and February 20, 2018." Taylor's speedy trial rights were not violated. Accordingly, Taylor's fifth assignment of error lacks merit, and it is overruled.

**{¶ 117}** Having overruled Taylor's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.


Copies sent to:

Nathaniel R. Luken
Karen S. Miller
Hon. Stephen Wolaver